No. 23-3735

IN THE

# United States Court of Appeals for the Sixth Circuit

_____

KAYLA JEAN AYERS,

*Petitioner - Appellant,*

v.

OHIO DEPARTMENT OF REHABILITATION AND CORRECTION, Director,

*Respondent - Appellee.*

_____

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO
NO. 5:20-CV-1654 (HON. SARA LIOI)

_____

**MERIT BRIEF OF PETITIONER - APPELLANT KAYLA JEAN AYERS**

_____

Brian C. Howe (0086517)
THE OHIO INNOCENCE PROJECT
Rosenthal Institute for Justice
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, Ohio 45221
T: 513-556-0752
F: 513-556-0702
Brian.Howe@uc.edu

*Counsel for Petitioner-Appellant*

i

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................iv

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST vi

STATEMENT IN SUPPORT OF ORAL ARGUMENT ......................................vii

STATEMENT OF JURISDICTION ................................................1

STATEMENT OF ISSUES ......................................................2

STATEMENT OF THE CASE.....................................................2

   I.   INTRODUCTION ........................................................2

   II.  STATEMENT OF FACTS ..............................................3

      A.  Investigation ...................................................4

      B.  Pre-trial Disclosure and Trial ..................................6

      C.  Trial ..........................................................8

      D.  2019 Lentini Report .............................................15

   III.  PROCEDURAL HISTORY ..............................................17

   A.  State Post-conviction Proceedings .................................17

   B.  Federal Habeas Proceedings........................................18

   C.  Appeal & Certificate of Appealability ..............................20

SUMMARY OF ARGUMENT ........................................................21

ARGUMENT....................................................................23

   I.   STANDARD OF REVIEW ..............................................23

   II.  STATUTE OF LIMITATIONS PURSUANT TO 28 U.S.C. § 2244(D)(1) 23

   III.  THE DISTRICT COURT ERRED BY DENYING MS. AYERS'S IAC CLAIM AS UNTIMELY ..............................................24

   A.  The 2019 Lentini Report is a "Factual Predicate" of the IAC Claim................................................................24

   B.  Ms. Ayers had no independent means of discovering the information in the Lentini Report, and she exercised reasonable diligence for a person in her circumstances...........26

**C. In the alternative, the Court should remand the case for further consideration of the relevant issues.**...............................34

CONCLUSION................................................................................35

CERTIFICATE OF COMPLIANCE..................................................37

CERTIFICATION REGARDING APPENDIX ..................................37

CERTIFICATE OF SERVICE ........................................................38

ADDENDUM ................................................................................39

# TABLE OF AUTHORITIES

## Cases

*Banks v. Dretke,*
    540 U.S. 668, 696 (2004)…………………………………………….. 29

*Bracey v. Superintendent Rockview SCI,*
    986 F.3d 274, 286-89, 291 (3d. Cir. 2021)………………………. 29

*Cook v. Stegall,*
    295 F.3d 517, 519 (6th Cir. 2002) ……………………………… 23

*DiCenzi v. Rose,*
    452 F.3d 465 (6th Cir. 2006)……………………………..… 27-28, 34

*Ege v. Yukins,*
    485 F.3d 364 (6th Cir. 2007)…………………………… 22, 26-27, 33

*Gentry v. Deuth,*
    456 F.3d 687 (6th Cir.2006)……………………………………… 2

*Granger v. Hurt,*
    90 F.App'x. 97, 100 (6th Cir.2004)………..……………………. 28

*Hasan v. Galaza,*
    254 F.3d 1150, 1155 (9th Cir.2001)……………………………. 26

*In re Stansell,*
    828 F.3d 412 (6th Cir. 2016)…………………………………….1

*Pace v. DiGuglielmo,*
    544 U.S. 408 (2005)………………………………………….fn.2

*Pennsylvania v. Finley,*
    481 U.S. 551 (1987)……………………………………….22, 33

*Rivas v. Fischer*,
   687 F.3d 514  (2d. Cir. 2012)..............................................24

*Souter v. Jones*,
   395 F.3d 577  (6th Cir. 2005) ......................................... 23, 34

*State v. Simpson*,
   61 N.E.3d 899 (2d.Dist. 2016)......................................   33

*Stokes v. Leonard*,
   36 F. App'x 801 (6th Cir. 2002).........................................31-32

*Strickland v. Washington*,
   466 U.S. 668 (1984)................................................... 24

*White v. Warden, Ross Correctional Inst.*,
   940 F.3d 270 (6th Cir.2019)............................................. 31

*Webb v. United States*,
   679 F. App'x 443 (6th Cir. 2017).......................................34-35

*Wims v. U.S.*, 225 F.3d 186  (2d Cir. 2000)................................ 35

## Statutes and Rules

28 U.S.C. § 2244.............................................................. *passim*

28 U.S.C. § 2254................................................................. 1

Ohio Rev. Code § 2909.15.......................................................1

**DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST**

Pursuant to Sixth Circuit Rule 26.1, Petitioner-Appellant offers the following disclosures:    Petitioner-Appellant Kayla Jean Ayers ("Ms. Ayers") is an individual and not a subsidiary or affiliate of a publicly owned corporation. No publicly traded corporation has a financial interest in the outcome of this appeal.

*/s/ Brian Howe*
Attorney for Petitioner-Appellant
Ayers

Date: March 25, 2024

### STATEMENT IN SUPPORT OF ORAL ARGUMENT

Petitioner-Appellant respectfully requests that the Court schedule oral argument in this case to assist the Court in understanding any outstanding factual and legal issues the Court deems relevant.

## STATEMENT OF JURISDICTION

The United States District Court for the Northern District of Ohio exercised subject matter jurisdiction over Ms. Ayers's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  On August 2, 2023, the District Court denied the petition in full and declined to grant a certificate of appealability. (Opinion, R.21; Judgment, R.22).

On September 1, 2023, Plaintiff filed a timely notice of appeal. (Notice of Appeal, R.23). On September 28, 2023, Ms. Ayers filed an Application for Certificate of Appealability, which this Court granted, in part, on February 15, 2024.  Pursuant to that order, this Court has jurisdiction over the present appeal.

Although Ms. Ayers was released from state prison on August 22, 2019, she remained on post-release control through August 22, 2022. A person subject to "post-release control" is "in custody" for purposes of federal habeas review. *In re Stansell*, 828 F.3d 412, 416 (6th Cir. 2016). Furthermore, as the result of her arson conviction, she continues to suffer collateral consequences under Ohio law.  *See, e.g.*, Ohio Rev. Code § 2909.15 (requiring arson offenders to register annually with the state "until the offender's death".). Because Ms. Ayers continues to suffer

harm as the result of the constitutional violations alleged in her petition, the petition is not mooted by the end of her imprisonment. *Gentry v. Deuth*, 456 F.3d 687, 693- 95 (6th Cir.2006).

## STATEMENT OF ISSUES

The District Court erred in holding that Ms. Ayers was not "reasonably diligent" in uncovering the factual predicate of her IAC Claim because Ms. Ayers reasonably relied on her trial counsel to investigate the basic soundness of State's expert testimony, and she had no reasonable means of independently recognizing the flaws in that testimony.

## STATEMENT OF THE CASE

## I.  INTRODUCTION

Kayla Ayers was convicted on the basis of junk science, presented by the government as irrefutable proof of her guilt.   Her trial attorneys not only failed to challenge this faulty evidence, but they failed to even investigate the key forensic issue at stake.  Ms. Ayers lacked the cause and the means to conduct her own forensic investigation, and the critical flaws in the case therefore remained hidden for over seven years.

Ms. Ayers ultimately learned what happened-- not as the result of her own diligence, but based a report procured by the Ohio Innocence Project. She filed her federal petition less than a year later.

The district court erred by holding Ms. Ayers responsible for investigating and uncovering these forensic issues herself, from prison, as part of "reasonable diligence" for federal habeas petitioners. Her petition was timely under 28 U.S.C. 2244(d)(1)(D), and this Court should reverse the district court's denial of her habeas petition and remand the matter for further proceedings.

## II.   STATEMENT OF FACTS

On October 3rd, 2012, at 8:21 P.M., the Massillon Fire Department received a report of a fire on 26th St. in Massillon, OH. (Massillon Fire Department Summary Call Sheet, R. 15-1, PageID#431). Multiple suppression units and an ambulance were dispatched. *Id.* The first suppression units arrived at the house at 8:28 P.M. (*Id.*; Massillon Fire Department Response Record, R. 15-1, PageID#432.). They quickly extinguished the fire, which was isolated to a mattress in the basement. (*Id.* at PageID#433).

The only people home at the time of the fire were Kayla Ayers ("Ms. Ayers") and her three-year-old son, Brennan Jr. (a.k.a. "Bubba"). (Massillon Police Department Incident Report- Part 2 ("Incident Report"), R. 15-1, PageID#434).  Ms. Ayers sustained a laceration on her hand after she slipped and broke a glass of water while trying to extinguish the fire herself. (Massillon Fire Department EMS Run Report ("EMS Report"), R. #15-1, PageID#435). Brennan Jr. was completely unharmed. (Incident Report, R. 15-1, PageID#434).

Initial reports from the scene state that Ms. Ayers was disoriented and frantic about the possibility of losing custody of her children. Trial Transcripts, R. 15-2, PageID#1286). Her neighbor, Jennifer Conley, stated that Ms. Ayers kept "repeating was she going to lose—Am I going to lose my kids, am I going to lose my kids?" (*Id*. at PageID#1284).

### A. Investigation

Ms. Ayers was treated at a local hospital and discharged that night. While at the hospital, she was interviewed by Massillon Fire Inspector Reginald Winters and Massillon Police Dept. Sgt. Muntean. (Massillon Fire Department Interview Report, R. 15-1, PageID#479). Initially, Ms. Ayers told authorities that she had been doing laundry in

the basement, and when she turned around, she noticed her son Brennan had started the fire. (*Id*.)

Inspector Winters interviewed three-year-old Brennan Jr. later that evening. (R. 15-2, PageID#1194). Winters confirmed that Brennan Jr. was able to light a cigarette lighter. (*Id*. at PageID#282). Although Brennan Jr. denied starting the fire, "he did respond by shaking his head "yes" when [Winters] asked if Mommy had fallen asleep before the fire. (*Massillon Police Department Narrative Supplement* ("Narrative Supplement"), R.15-1, PageID#480).

Inspector Winters also examined both Ms. Ayers and Brennan Jr. for soot. Although Ms. Ayers did not have any soot on her arms and hands, swabs of her nostrils supposedly showed "light soot." (R.15-2, PageID#1192). Winters "did not observe" any soot when talking to Brennan Jr. at the neighbor's house later that night. (*Id*. at PageID#1194). By the time Brennan was examined, however, the neighbor, Jennifer Conley, had already gotten Brennan "cleaned up" and changed his clothes. (R. 15-2, PageID#1287).

The next day, Inspector Winters spoke with Jeff Ayers, Ms. Ayers's father. Jeff claimed that several weeks before, during a fight,

Ms. Ayers told him, "if you leave again, I'll burn this mf'er down."
(*Massillon Fire Department Voluntary Statement,* R. 15-1, PageID#481).
Another neighbor, Jason Pandrea, testifying about this same instance,
said Ms. Ayers told her father she would "burn the mother fucker
down." (Transcripts, R. 15-2, PageID#1234, 1263). According to
Pandrea, "it was more kind of a laugh or a joke kind of thing," and "it
was like she meant it, but she didn't." (*Id*. at PageID#1264).

Officers asked Ms. Ayers to come with them to the police station,
where she was interviewed again. After questioning, Ms. Ayers
admitted that she "may have fallen asleep" before the fire, but insisted
that when she woke up she did what she could to put it out. (Narrative
Supplement, R. 15-1, PageID#480).

That day, Ms. Ayers was arrested and charged with aggravated
arson and endangering children. (Docket, R. 15-1, PageID#907-08).
She was unable to post bail and would remain in jail for the next
several months awaiting trial. (Kayla Ayers Affidavit at ¶ 3, R. 15-1,
PageID#493).

**B. Pre-trial Disclosure and Trial**

Ms. Ayers pleaded not guilty to all charges. (Entry, R. 15-1, PageID#275). The Stark County Public Defender's Office was appointed as counsel, and Attorney Kristina Powers was assigned. (*Id.*) Defense counsel made multiple requests for discovery in the months leading up to the trial. The defense requested discovery on November 9, 2012 – over two months before trial started. (Demand for Discovery, R. 15-1, PageID#276-77).  They received discovery documents from the state on November 15, November 19, December 14, and January 17 – the last disclosure just nine days before trial.  (Discovery Receipts, R.15-1, Ex. 7, 8, 11, 13, PageID#286-95).

Throughout this period, Ms. Ayers remained in jail, and her trial was continued several times.  Trial was originally set for December 3, 2012 but was rescheduled first to December 27, 2012 and then again to February 4, 2013.  (Docket, R. 15-1, 56, PageID#908-11). The trial was rescheduled once more and finally held on January 28, 2013. (*Id.*).

In mid-January 2013, less than two weeks before trial, Ms. Ayers's defense was assigned to a new attorney at the public defender's office, Matthew Kuhn. In the 100 days leading up to trial, neither Ms. Powers nor Mr. Kuhn consulted with an independent arson expert.  (Proffer of

Testimony of Attorneys Kristina Powers and Matthew Kuhn, R. 15-1, PageID#496).

**C. Trial**

1.    <u>Testimony & Conclusions of Inspector Reginald Winters</u>

The core of the State's case at trial was the testimony of Fire Inspector Reginald Winters.  Winters testified that he had approximately 70 hours of fire investigation classes, combined with just over ten hours per year of continuing education. (Transcripts, R. 15-2, PageID#1151-52).

When he examined the fire in Ms. Ayers's home, Winters claimed he noticed an "unusual burn pattern" on the mattress, which he diagnosed as the first point of ignition:

> "Well, I had noticed that [the northeast side of the mattress] had a heavier char pattern where the springs—what we call—I'll try to explain it to you, it's called calcination.  It's basically where the fire burned so hot that it will turn the springs white and they'll collapse.  And on that end I had noticed where the fire had burnt the hottest and it traveled westward.  Like it was—there's where, right there, made a conclusion that I had a fire start there that was low and it started there and traveled west toward the wall because that's where the material was at, that it was consuming as it was burning."

(*Id.* at PageID#1164-65.)

According to Winters, a separate and distinct ignition occurred near a wooden post, next to where a door had been leaning against the bed:

> "If you look at [the post], you have the concrete floor, you go up and you have concrete, kind of pyramid, and then right there you can see a clear point of the V-pattern that I was telling you about, the starting point right there, the origin. *** [The V-pattern] is telling me the point of origin of a fire consistent [sic] where the fire started.  It started low and it started climbing the post with the heavy charring and stuff like that."

(*Id.* at PageID#1169-70).

Winters confirmed that his "certified arson opinion" was that the fire started in two separate and distinct locations, and that the cause of the fire was "incendiary." (*Id.* at PageID#1173-74).

On cross examination, defense counsel questioned Inspector Winters about an initial Executive Summary and report from his office. (*Id.* at PageID#1206-09). The Initial Report claimed that the fire started on the first floor, and that ignitable liquid vapors or gasoline were used as an accelerant. (*Defendant's Trial Exhibit A*, R. 15-1, PageID#498). Winters acknowledged that the Initial Report was incorrect, but he explained that the summaries on these documents were "typo[s]," where

old information from prior reports had not been removed. (Transcripts,

Doc 15-2, PageID#1209).

On redirect, the prosecution asked Inspector Winters to read his

"final" Executive Summary. (*Id.* at PageID#1220). Defense counsel

objected, asking whether this document had been provided.  At sidebar,

the prosecution answered:

> Mr. Barr:  Provided in discovery, Your Honor, the origin and
> cause report, and I'm asking him [Winters] to read this
> based upon the cross-examination of documents that I
> believe he [Mr. Kuhn] received from Massillon Municipal
> Court that were not the final report and that contain
> typographical errors.  I believe the jury needs to know this.

> The Court:  Okay.  Do you want to take a look at this?

> Mr. Kuhn:  Yeah, if I could.

> Mr. Barr:  There is the discovery [November] 15, 2012, it
> indicates origin and cause from Massillon Fire Department.
> The document he has, we don't have in our file.  This is the
> only document we could have given him.

> Mr. Kuhn: Yeah, I'll do that real quick.
>                               ***

> Mr. Kuhn:  If we signed for them, we signed for them.

> The Court:  If you could approach for just a minute *** Put
> on the record with respect to the document with which Mr.
> Winters is being currently examined regarding it appears as
> though the Defense did sign for the report, and therefore,
> you are permitted to cross-examine him."

(*Id*. at PageID#1221-1224).

The State then asked Inspector Winters to read his entire Executive Summary into the record. According to the Executive Summary, the fire was "incendiary" and started on the mattress:

> "After examination of the fire scene it was determined the fire originated in the basement on the bed. After examination of the fire scene, interviewing witnesses, interviewing the insured and using the levels of scientific certainty as discussed in the 2011 edition of *NFPA 921; A Guide for Fire and Explosion Investigation*, it is my opinion the ignition source for the fire was some type of open flame. The materials first ignited were blankets on the bed. The act or omission that brought the ignition source and the materials first ignited together was the deliberate act of a person or persons. Using these elements of a fire cause, the cause of the fire is incendiary."

(*Id*. at PageID#1224-25).

Neither the Initial Report nor the final Executive Summary and Report mentioned Winters' conclusion that the fire had multiple points of origin. (*Id*. at PageID#1221-25). *See also, Defendant's Trial Exhibits A & D,* R.15-1, PageID#488-89.) After the confusion surrounding the Initial Report, defense counsel did not offer any further objection to the substance of Winters' testimony, nor did he challenge Winters' conclusion that the fire was started in two separate places.

2. <u>Closing Arguments</u>

Winters' conclusion regarding the alleged multiple points of origin became the centerpiece of the State's closing argument. Specifically, the State argued that if the fire had two separate and distinct points of origin, then an accidental fire was practically impossible:

> "I'll also remind you that common sense, your common sense, doesn't fly out the window when you walk in this courtroom. If you fall asleep and you drop a cigarette on a mattress, it starts a fire right? It's common sense. **It doesn't jump and start another fire, it's not possible**. .*** There are two separate and distinct origins here according to the expert, according to the pictures. Fire doesn't jump like that. So everything was ruled out except incendiary, and that was to a reasonable degree of scientific certainty.**"

(Transcripts, Doc 15-2, PageID#1350)(emphasis added).

The two points of origin theory was also critical to the State's argument that Brennan Jr. (a.k.a. "Bubba") could not have started the fire. Specifically, the State argued that Brennan Jr. would have gotten soot on him if he had started a second fire while the first fire was already burning:

> "And, again, common sense. You believe that first story that the defendant said, "Bubba started the fire," he would have to hold a lighter like you remember Inspector Winters demonstrating how he had to hold that lighter? He had to hold the lighter, ignite the mattress, **then go and start a**

**second fire, the whole time, no soot, no smoke, not getting burned**? **Impossible.** They all told you, the firefighters told you, he would have something on him because if he was exposed to that fire, that smoke, he would have something on him. He had nothing. **Because remember when—he has to start that second fire, the first point of origin is burning**."

*(Id.* at PageID#1350-51) (emphasis added).[1]

During its rebuttal, the State continued to stress the importance

of Winters' expert opinion in proving Ms. Ayers's guilt:

"We have a criminal justice system because criminals, even ones whose guilt have been overwhelmingly proven to you, like Kayla Ayers, don't always admit that guilt. **And this system requires experts, like Mr. Winters, who have to come in here and give you your opinion—their opinion so that you can make decisions beyond a reasonable doubt.**"

*(Id.* at PageID#1373) (emphasis added). Again, the State emphasized

Winters' conclusion regarding multiple points of origin ruled out an

accidental fire:

"There's one [point of origin] right there. And there's the second one right there. But, wait, oh, it's an accident. An accident that started twice. So she must have been smoking two cigarettes, one

---

[1] The absence of soot on Brennan Jr. could be explained if the fire only had one point of origin, and the child fled immediately after setting it to wake his mother up. It would also be further complicated by the fact that the neighbor, Jennifer Connely, appears to have "cleaned up" Brennan before Inspector Winters examined him. (Transcripts, R. 15-2, PageID#1287).

for each hand, and then threw one on this side of the bed and one on this side of the bed, when that becomes her part of the story."

(*Id*. at PageID#1374). The State also re-emphasized that, with a barrier blocking a portion of the bed, three-year-old Brennan could not have lit the mattress on fire in multiple places:

> "[T]here's only two other plausible explanations as it's been stated, that it was a cigarette, but it had to be two cigarettes because we got two points of origin because fire doesn't hop from one side to the other, so the other plausible explanation is Bubba started the fire.
>
> So Bubba had to crawl over that mattress and get over here first and light this fire.  And then he can't crawl over that door there because that's a door that sits high, it's a regular door just like that door right there, sitting on its side, you know how hard it would be for you to throw your leg over it and now you're going to ask a three-year-old to crawl over that without knocking it over? So then he has to crawl over that burning mattress and come over here to the front side of it and light this part on fire.  That's plausible? No."

(*Id*. at PageID#1378-79)

Defense counsel argued that the State had not proven its case beyond a reasonable doubt and insisted that the fire might have been started by Brennan or by an unattended cigarette butt. *(Id*. at PageID#1371).  But Ms. Ayers's attorney did not attempt to counter any of the State's specific arguments regarding the fire's alleged multiple points of origin. (*Id*. at PageID#1371-72).  Instead, the defense asked

the jury to note that Inspector Winters only claimed to offer "scientific certainty," not "absolute certainty." (*Id*. at PageID#1361-62, 1372) The jury returned a guilty verdict against Ms. Ayers on aggravated arson and endangering children charges. (*Id*. at Page ID#1406-07).

Ms. Ayers continued to maintain her innocence at sentencing. She explained that she only went to trial "because I really didn't do it so I was sure I wouldn't be found guilty." (*Id*. at PageID#1417-18). The trial court sentenced her to seven years' imprisonment, with three years' post-release control. Throughout the investigation, trial, and appeals, Ms. Ayers has consistently maintained her innocence. (Ayers Affidavit *at ¶11*, R.15-1, PageID#495).

### D. 2019 Lentini Report

John Lentini is one of the foremost forensic arson experts in the United States. He is the former chair of the Forensic Science Committee for the International Association of Arson Investigators, and he was selected by the U.S. Justice Department to serve on a planning panel to recommend national standards for fire and arson investigation. (Affidavit of John Lentini, ("Lentini Affidavit"), at ¶¶4-5, Doc 15-1, PageID#500-526). Lentini wrote one of the primary textbooks on fire

investigation, <u>Scientific Protocols for Fire Investigation</u>, which is
currently in its third edition.  He also served as a principal Member of
the National Fire Protection Association, and for twenty years he served
on the technical committee responsible for drafting the *NFPA 921,*
*Guide to Fire and Explosion Investigation*— the same guide Inspector
Winters supposedly relied on for his procedures and conclusions.
(*Lentini Affidavit* at ¶4- 6, R. 15-1, PageID#502-04).

In the summer of 2019, Mr. Lentini reviewed the 2013 testimony
and summary conclusions of Inspector Winters at the request of the
Ohio Innocence Project.  (Affidavit of Ohio Innocence Project at ¶2,
R.15-1, PageID#527; Lentini Affidavit at  ¶7, R.15-1, PageID#504). Mr.
Lentini produced a final report on July 29, 2019.  (*Id*. at PageID#518).
According to Lentini's analysis, "the expert testimony presented to the
jury by Mr. Winters was unreliable, unscientific, and at odds with
generally accepted fire investigation methodology."  (*Id*. at ¶ 32,
PageID#517).  With regards to the "two points of origin" theory, Mr.
Lentini concluded:

> "The 'fires' on the mattress are not 'separate.'  They are not 'non-
> related.'   There is no evidence that they were 'simultaneously
> burning.' The damage is indistinguishable from damage caused by
> normal fire spread from a single point of origin."

(*Id*. at ¶15, PageID# 507).  More generally, Lentini concluded "unequivocally and to a reasonable degree of professional certainty" that:

> (1) "The proposition that this fire had two points of origin is unsupportable by any generally accepted methodology,"
>
> (2) "Mr. Winters used circular logic to conclude that the fire could not have been set by Ms. Ayers's son Brennan,"
>
> (3) "Despite claiming to follow NFPA 921, Mr. Winters disregarded its guidance in several important ways," and
>
> (4) "Mr. Winters demonstrated by his testimony that he is not qualified to investigate fires per NFPA 1033, the generally accepted industry standard."

(*Id*. at ¶ 9, Page ID#504-05). None of these conclusions were ever put before either the Court or the jury during Ms. Ayers's original trial.

## III.  PROCEDURAL HISTORY

### A. State Post-conviction Proceedings

On April 13, 2020, Ms. Ayers submitted two filings to the Court of Common Pleas for Stark County, Ohio: a *Motion for Leave to File a Motion for New Trial* pursuant to Ohio Crim.R.33(B), and a *Petition for*

*Postconviction Relief* pursuant to Ohio Rev.Code 2953.21-23.  (R. 15-1, Ex. 35 & 36, PageID#416-528).  In these state proceedings, Ms. Ayers asserted claims of ineffective assistance of counsel, prosecutorial misconduct, actual innocence, and a violation of her due process rights by the State's use of inherently untrustworthy evidence.  The State of Ohio received six separate extensions of time to respond, and the matter was fully briefed by March 2021.

Both motions were denied on procedural grounds. (R. 15-1, PageID#723-28).   On appeal, the Ohio Court of Appeals for the Fifth District affirmed the denial of both Ms. Ayers's Petition for Postconviction Relief and her Motion for Leave to File a Motion for New Trial. (2022 Fifth Dist. Opinion, R. 15-1, PageID#826).  Ms. Ayers filed a timely notice of appeal to the Ohio Supreme Court, which declined jurisdiction on September 27, 2022.  (R. 15-1, PageID#868-906).

### B. Federal Habeas Proceedings

On July 27, 2020, during the pendency of her state postconviction proceedings, Ms. Ayers filed a Petition for Writ of Habeas Corpus in the Federal District Court for the Northern District of Ohio.  (Petition, R.

1).[2]  On December 3, 2020, the district court granted Ms. Ayers's motion to hold her petition in abeyance while she continued to pursue relief in Ohio courts. On December 6, 2022, with the state proceedings concluded, the district court lifted its stay and entered a scheduling order. (Order Granting Petitioner's Motion to Lift Stay, R. 13).

On December 19, 2022, Ms. Ayers filed her Amended Petition for Writ of Habeas Corpus.  (Amended Petition, R. 14).  After additional briefing, the magistrate issued a Report & Recommendation that Ms. Ayers's petition be dismissed. (R&R, R.18). Ms. Ayers filed timely objections. (Objections, R.20).

On August 2, 2023, the district court issued a Memorandum Opinion and Order and Judgement Entry denying Ms. Ayers's petition as time-barred. (Opinion, R. 21; Entry, R. 22).  The district court also declined to issue a certificate of appealability ("COA").

---

[2] Although her state postconviction proceedings were pending at the time, Ms. Ayers could not know in advance whether Ohio courts would find those motions timely, and therefore whether she would receive the benefit of statutory tolling pursuant to 28 U.S.C. 2244(d)(2).  To ensure she did not miss the federal statute of limitations, she filed a concurrent "protective" federal habeas petition and requested it be stayed pending resolution of her state claims, as suggested by the U.S. Supreme Court in *Pace v. DiGuglielmo*, 544 U.S. 408, 416, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005).

## C. Appeal & Certificate of Appealability

Ms. Ayers filed a timely Notice of Appeal and an Application for Certificate of Appealability.  On February 15, 2024, this Court granted the Application for Certificate of Appealability, in part.  (Order, February 15, 2024).  Specifically, the Court held that "the Lentini Report at least arguably provides a factual basis" for several of Ms. Ayers's claims, and "it is at least arguable that the district court erred in concluding that Ayers could have discovered the Lentini Report earlier if she had exercised due diligence."  *Id*. at 3.  The Court also held that reasonable jurists could debate whether Ms. Ayers's claim for ineffective-assistance-of-counsel ("IAC Claim") was "arguably valid or meritorious."  *Id*. at 6.  The Court declined to issue a COA on the remainder of Ms. Ayers's claims, or on issues related to her actual innocence or equitable tolling arguments.  This Court granted the COA for the limited purpose of determining whether the district court erred by finding Ms. Ayers's IAC Claim was untimely pursuant to 28 U.S.C. § 2244(d)(1)(D).

### SUMMARY OF ARGUMENT

Indigent defendants must be able to trust that their trial attorneys will investigate complicated forensic science claims made by the government. When those attorneys fail to take even minimum steps to investigate the government's claims, indigent defendants are left in the dark, unaware of whether something more could or should have been done in their defense. Sometimes the government's forensic evidence will have been sound. Occasionally, as here, the government's forensic evidence will have been "unreliable, unscientific, and at odds with generally accepted fire investigation methodology." (Lentini Affidavit at ¶ 32, R.15-1, PageID#517). With no entitlement to postconviction review, even "reasonably diligent" defendants will rarely be in a position to determine that their trial attorneys have betrayed their trust or to know what would have happened had an adequate investigation been done.

Ms. Ayers is indigent with a tenth-grade education. She reasonably relied on her trial attorneys to investigate the soundness of the State's forensic evidence. She had no reason to conduct her own

forensic investigation from jail or prison, and she could not have done so even if she thought it was necessary.

Ultimately, the Ohio Innocence Project retained an expert to produce a report investigating and ultimately rejecting the forensic conclusions central to the government's case. But Ms. Ayers had no entitlement to this or any other postconviction review, and no amount of diligence on her part could have forced a third party to retain an expert review that she herself could not afford. *Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987). Ms. Ayers did not obtain the Lentini Report by her own diligence at all, but by factors that were entirely outside her control and that were ultimately "fortuitous." *Ege v. Yukins*, 485 F.3d 364 (6th Cir. 2007). In such cases, this Court has held that the petitioner's actual discovery of the predicate fact is the date on which the clock should start for purposes of §2244(d)(1)(D). *Id.*

Because Ms. Ayers's IAC Claim was filed within 1 year of the Lentini Report, it was timely for purposes of 28 U.S.C. 2244(d)(1)(D), and this Court should reverse the district court entry dismissing her petition as untimely and remand the matter for further proceedings.

## ARGUMENT

### I.  STANDARD OF REVIEW

The dismissal of a habeas petition as untimely under 28 U.S.C. §2244 is reviewed by this Court *de novo*.  *Souter v. Jones*, 395 F.3d 577, 584 (6th Cir. 2005); *Cook v. Stegall*, 295 F.3d 517, 519 (6th Cir. 2002)("The dismissal of a habeas petition by the district court as barred by 28 U.S.C. § 2444's statute of limitations is reviewed de novo.").

### II.  STATUTE OF LIMITATIONS PURSUANT TO 28 U.S.C. § 2244(D)(1)

28 U.S.C. § 2244(d)(1) controls the timeliness of a federal habeas petition by a person in state custody.  Specifically, a claim must be presented within one year of the latest of four possible triggering dates, set forth in § 2244(d)(1)(A) – (D).

Ms. Ayers concedes that her claims would be untimely under subsections (d)(1)(A) – (C).  The issue before this Court is whether her IAC Claim is timely under subsection (D)—that is, whether she presented her IAC Claim within one year from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D).

Here, the factual predicate of Ms. Ayers's IAC Claim is the Lentini
Report, issued July 29, 2019.  Ms. Ayers could not have obtained this
report earlier, on her own, using reasonable diligence, and her petition
was filed within one year of the Lentini Report.  It is therefore timely
for purposes of § 2244(d)(1)(D).

### III. THE DISTRICT COURT ERRED BY DENYING MS. AYERS'S IAC CLAIM AS UNTIMELY

#### A. The 2019 Lentini Report is a "Factual Predicate" of the IAC Claim.

Although the term "factual predicate" is not defined by statute,
courts have held that a factual predicate refers to those "vital facts
underlying the claim *** without which the claim would necessarily be
dismissed." *Rivas v. Fischer*, 687 F.3d 514, 535 (2d. Cir. 2012).

The "vital facts" for a claim asserting ineffective assistance of trial
counsel must address two distinct prongs: (1) that counsel's
performance was objectively deficient, and (2) that this deficient
performance prejudiced the petitioner, i.e., that but for this deficient
performance, there is a reasonable probability that she would have been
acquitted.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052,
80 L.Ed.2d 674 (1984).

Here, the trial record was silent on the "vital facts" of Ms. Ayers's IAC Claim. Specifically, Inspector Winters's conclusions were unchallenged at trial, and the record contains no reference as to what, if anything, her attorneys had done to investigate those conclusions.

It is only with facts outside the record that Ms. Ayers's IAC Claim becomes viable. Specifically, Ms. Ayers now has evidence that (1) the State's arson conclusions were false and could therefore have been strongly impeached if not excluded entirely, and (2) that her trial counsel had not done any research on these critical forensic issues. With this context, her IAC Claim is complete. The defense's failure to challenge the State's arson testimony was not harmless error— Inspector Winters' testimony could have been impeached as flawed, unscientific, and misleading on critical issues of fact. Furthermore, the defense's decision not to object to the "two points of origin" conclusion on evidentiary grounds was not a strategic one—it was borne of complete ignorance of the forensic issues at play.

The 2019 Lentini Report is the later-available of the factual predicates that make up the "vital facts" of Ms. Ayers's IAC Claim. It therefore controls the triggering date for purposes of §2244(d)(1)(D).

*See Hasan v. Galaza*, 254 F.3d 1150, 1155 (9th Cir.2001)(setting a 2244(d)(1)(D) triggering date prior to the time when a petitioner could have discovered prejudice "is analogous to holding that a tort claim accrued when the plaintiff had knowledge of her injury but before she had discovered the cause").

Ms. Ayers's IAC Claim was filed within 1 year of the Lentini Report. The question therefore becomes whether she exercised "due diligence" in obtaining that factual predicate.

### B. Ms. Ayers had no independent means of discovering the information in the Lentini Report, and she exercised reasonable diligence for a person in her circumstances.

This Court has recognized that state prisoners cannot always be reasonably expected to discover faulty forensic testimony on their own. *Ege v. Yukins*, 485 F.3d 364 (6th Cir. 2007). In *Ege*, a Michigan habeas petitioner argued that her conviction unconstitutionally rested on unreliable bite mark testimony. *Id*. at 374. In support, she relied in part on a letter from prosecutors, obtained four years after her conviction, indicating that the state's bite mark expert had offered unreliable testimony in other cases. The warden argued that Ege's claims were time barred, since bite mark testimony was "controversial"

at the time of trial, and evidence undermining the expert could have been discovered earlier with due diligence pursuant to § 2244(d)(1)(D). *Id*. at 372-73.

This Court held that, while it was clear at trial that parts of the expert's testimony lacked *evidentiary* foundation, "we cannot say that it should have been similarly obvious to Ege that the *substance* of the physical evidence—at least as presented by Dr. Warnick—was complete bunk." *Id*. at 373 (emphasis sic).  Instead, despite the controversy around bite mark testimony, the petitioner's discovery of evidence undermining the substance of the state's expert testimony was "entirely fortuitous[ ]." *Id*. Prior to uncovering the letter, petitioner "likely felt that she did not have a basis for pursuing her due process claim." *Id*. at 374. Regarding "sham" expert testimony, the Court analogized it to other kinds of false testimony and held that "[i]n such cases, the petitioner could not have been reasonably expected to discover the misconduct during pretrial discovery or trial." *Id*. at fn.4.

This Court has also recognized that, even with due diligence, an ineffective assistance of trial counsel claim may not be discoverable for years after trial. *DiCenzi v. Rose*, 452 F.3d 465, 471 (6th Cir. 2006).  In

*DiCenzi*, the issue was whether the petitioner exercised due diligence in first raising his claims several years after the expiration of his time for direct appeal, when neither the state trial court nor his trial attorney had informed him of his right to appeal.  This Court noted that "had DiCenzi merely inquired of a court or a public defender regarding whether he had the right to an appeal, he could have found out that he did."  *Id*. at 470.  Despite the information in question being available with a simple inquiry, the Court refused to dismiss the petition as necessarily untimely.  Instead, the Court noted that § 2244(d)(1)(D) "does not require the maximum feasible diligence, only 'due,' or reasonable, diligence."  *Id*., quoting *Granger v. Hurt*, 90 Fed.Appx. 97, 100 (6th Cir.2004)(unpublished).   Furthermore, the diligence analysis requires that courts take into account "the realities of the prison system."  *Id*.  Under those circumstances, the Court remanded the case to the district court for specific factual development regarding when a "reasonably diligent" prisoner in DiCenzi's position would have discovered his appeal rights.

Both *Ege* and *DiCenzi* are properly applicable here.  In *Ege*, this Court did not demand that the petitioner detail what she had done to

search for potential flaws in the state's bite mark evidence prior to discovering that the state itself had disclaimed its former expert. Instead, the Court recognized that the "bunk" expert testimony would not have been apparent to her, whether before trial or after. *Ege*, 485 F.3d at 374. Similarly, because Inspector Winters was allowed to present his faulty conclusions without challenge, Ms. Ayers had no reason to believe she should examine that testimony for flaws. She did not spend her first five years in prison biding her time or taking a lackadaisical approach to forensic arson research. Instead, like the petitioners in *Ege* and *DiCenzi*, she simply was unaware that the system designed to protect her against false testimony had broken down.

In fact, it is reasonably diligent for criminal defendants to presume that their attorneys have fulfilled their constitutional duties, especially where those duties involve investigating complicated forensic issues that are outside the ability of a lay defendant to evaluate or audit. *Banks v. Dretke*, 540 U.S. 668, 696 (2004)("Ordinarily, we presume that public officials have properly discharged their official duties."). *See also, Bracey v. Superintendent Rockview SCI*, 986 F.3d

274, 286-89, 291 (3d. Cir. 2021)(it is "reasonably diligent" for purposes of § 2244(d)(1)(D) for petitioners to presume the government has made constitutionally-required disclosures).  Because Ms. Ayers's trial attorneys were not independently knowledgeable about forensic arson issues, it should have been obvious to *them* that they needed to consult with someone who could evaluate those issues.  That was their job—and their duty, both ethically and constitutionally.  In contrast, the Constitution does not expect or require criminal defendants like Ms. Ayers to conduct their own parallel forensic investigation while in pretrial detention or state prison.  If Ms. Ayers's attorneys failed to challenge Winters's "two points of origin" conclusion, a "reasonably diligent" client in her position should be allowed to assume that this was an informed decision rather than an abdication of duty.  The alternative would require "reasonably diligent" prisoners adopt a default presumption that all forensic testimony introduced against them was false, and that their own attorneys were incompetent.  Such an approach is not required by "reasonable diligence" or by this Court's precedent.

In dismissing the petition as untimely, the district court relied on an unpublished 2002 decision, *Stokes v. Leonard*, 36 F. App'x 801 (6th Cir. 2002).  In *Stokes*, this Court rejected a petitioner's argument that the statute of limitations should run from the date he obtained an expert report challenging the state's expert testimony regarding child abuse allegations.  Unlike the present case, the petitioner in *Stokes* "presented nothing to support his claim that the help of an expert was necessary to his discovering his trial attorney's poor performance."  *Id.* at 805.  Furthermore, the Court noted that Stokes had not explained why the alleged deficiencies of his trial counsel were not recognized and brought to light by his attorney on direct appeal.  *Id.*

 Here, Ms. Ayers could not have relied on her appointed appellate attorney to uncover the flaws in Winters testimony.  Ohio direct appeals are limited to the record of the proceedings at trial. *White v. Warden, Ross Correctional Inst.*, 940 F.3d 270, 277 (6th Cir.2019). Ms. Ayers's trial record is completely silent as to whether her defense attorneys had consulted with an independent arson expert, or whether they themselves had experience in arson cases that would have allowed them to evaluate Winters's conclusions.  And Ms. Ayers's claim is not that

Winters' testimony was recognizably "bunk" on its face, but that the flaws in his testimony would have been uncovered had her trial attorneys fulfilled their constitutional obligation to investigate the government's key forensic evidence. The time for such outside investigation was prior to trial, not during direct appeal.

Without any reason to believe her attorneys had failed her, and without the resources or ability to independently review Winters' conclusions even if she had reason to doubt them, this is a rare case where Ms. Ayers "could not have discovered [she] needed an expert until [she] had an expert." *Stokes*, 36 F. App'x at 805. Few such cases will result in a viable habeas petition—not because of petitioners' delay or inaction, but because most reasonably diligent petitioners in Ms. Ayers's circumstances will never discover the constitutional violation at all.

Here, the record shows that it was the Ohio Innocence Project that retained Mr. Lentini to review Winters's conclusion, and it was the Ohio Innocence Project that obtained his report on July 29, 2019. (Affidavit of Ohio Innocence Project at ¶2, R.15-1, PageID#527; Lentini Affidavit at  ¶7, R.15-1, PageID#504). But Ms. Ayers was not constitutionally or

statutorily entitled to the assistance of the Ohio Innocence Project or any other pro bono postconviction attorney. *Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987) ( "the right to appointed counsel extends to the first appeal of right, and no further"); *State v. Simpson*, 61 N.E.3d 899, 904 (2d.Dist. 2016)(Ohio law provides "no right, statutory or constitutional, to the appointment of an expert to assist in [a] post-conviction relief petition."). Ms. Ayers had no ability, through the exercise of any amount of diligence, to force the Ohio Innocence Project to review her case.  Nor did she have any means to force the Ohio Innocence Project, or any other party, to hire an expert to evaluate the testimony in her case.  That she ultimately did obtain this review is similar to the petitioner's "fortuitous" discovery of the factual predicate in *Ege*, 485 F.3d at 373 (6th Cir. 2007).  In both situations, the ultimate discovery of the factual predicate remained outside the petitioners' control, regardless of their diligence.

Of course, once the Lentini Report was produced to her, Ms. Ayers was on notice of the factual predicate of her IAC Claim.  At that point, she was required to present that claim within one year pursuant to §2244(d)(1)(D), regardless of her indigence or resources or lack of legal

training. *See Webb v. United States*, 679 F. App'x 443, 448 (6th Cir. 2017)(the appropriate date for purposes of §2244(d)(1)(D) is when the petitioner discovers or could have diligently discovered the predicate facts, not the date he could have discovered the "legal significance" of those facts.) *see also Souter v. Jones*, 395 F.3d 577, 586-87 (6th Cir. 2005)(analyzing the date of the latest "new evidence" affidavit for purposes of the trigger date under §2244(d)(1)(D).)

The earliest that Ms. Ayers could have been aware of the Lentini Report was July 29, 2019, and her IAC Claim was filed less than one year later, on July 27, 2020.  It is therefore timely.

### C. In the alternative, the Court should remand the case for further consideration of the relevant issues.

Where the record below is unclear as to when the petitioner became aware of a predicate fact for purposes of § 2244(d)(1)(D), this Court has remanded the matter to the district court for further factual findings. *DiCenzi v. Rose*, 452 F.3d 465, 471-72 (6th Cir. 2006).

Specifically, when the petitioner's actions are "not so clearly unreasonable that it plainly appears from the face of [the] petition and supporting papers that he is barred from habeas relief, [then] the

district court's dismissal of appellant's petition cannot stand." *Id.*, quoting *Wims v. U.S.*, 225 F.3d 186, 190-91 (2d Cir. 2000); *cf. Webb v. United States*, 679 F. App'x 443, 448–49 (6th Cir. 2017)(declining to remand when the district court had already held a full hearing on the issue of diligence.).   For the reasons stated above, Ms. Ayers has demonstrated due diligence for purposes of §2244(d)(1)(D).   At minimum, however, this Court should remand the matter for further factual findings as the Court may deem appropriate.

## CONCLUSION

For these reasons, Petitioner-Appellant Kayla Jean Ayers respectfully requests this Court reverse the district court's denial of Ms. Ayers's IAC Claim and remand the matter for further proceedings on that claim.  In the alternative, Ms. Ayers requests the Court remand the matter for further factual development and consideration of Ms. Ayers's diligence under the proper standard.

Respectfully submitted,


*/s/ Brian C. Howe*
Brian C. Howe (0086517)
THE OHIO INNOCENCE PROJECT
Rosenthal Institute for Justice
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, Ohio 45221
T: 513-556-0752
F: 513-556-0702
Brian.Howe@uc.edu

*Counsel for Petitioner-Appellant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation set forth in Sixth Circuit Local Rule 32(a)(7)(B). According to the word-processing system used for the brief, it contains 7,131 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

*/s/ Brian C. Howe*
Brian C. Howe
*Attorney for Petitioner-Appellant*

## CERTIFICATION REGARDING APPENDIX

I hereby certify that all documents and records identified by 6 Cir.R. 30(b)(2)(A) are already part of the district court's electronic record, including the state court record pursuant to 6 Cir.R.30(b)(5). An appendix is therefore unnecessary and shall not be filed. 6 Cir.R. 30(a)(1).

*/s/ Brian C. Howe*
Brian C. Howe
*Attorney for Petitioner-Appellant*

### CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2024, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>*/s/ Brian C. Howe*</u>
Brian C. Howe
*Attorney for Petitioner-Appellant*

ADDENDUM
**Designation of District Court Record**

Petitioner-Appellant designates the following district court documents:

| Record Entry Number | Description of Document | PageID# Range |
|---|---|---|
| 1 | Petition for Writ of Habeas Corpus (§2254) w/ Appendix | 1-51 |
| 2 | Motion to Hold Petition in Abeyance Pending Exhaustion | 53-57 |
| 13 | Order Granting Petitioner's Motion to Lift Stay | 91-92 |
| 14 | Amended Petition | 102-136 |
| 15 | Respondent's Return of Writ | 137-267 |
| 15-1 | State Court Entry | 275 |
| 15-1 | Defendant's Demand for Discovery | 276-77 |
| 15-1 | Discovery Receipts | 286-95 |
| 15-1 | Defendant's Petition for Postconviction Relief | 416-23 |
| 15-1 | Defendant's Motion for Leave to File a Motion for New Trial | 424-30 |
| 15-1 | Massillon Fire Department and Police Records | 431-480 |
| 15-1 | Affidavit of Kayla Ayers | 493-95 |
| 15-1 | Proffer of Testimony of Attorneys Kristina Powers and Matthew Kuhn | 496-97 |
| 15-1 | Defendant's Trial Exhibit A | 498 |
| 15-1 | Defendant's Trial Exhibit D | 499 |
| 15-1 | Affidavit of John Lentini | 500-526 |
| 15-1 | Affidavit of Ohio Innocence Project | 527 |
| 15-1 | Judgment Entry Denying Defendant's Petition for Post-Conviction Relief and Motion for Leave to File for New Trial | 723-28 |
| 15-1 | 2022 Fifth District Opinion | 826 |
| 15-1 | Stark County Common Pleas Court Docket | 907-916 |
| 15-2 | Trial Transcripts | 924-1422 |
| 16 | Petitioner's Traverse | 1423-1471 |

| 17 | Respondent's Reply to Traverse | 1472-1498 |
| 18 | Magistrate's Report and Recommendation | 1499-1517 |
| 20 | Petitioner's Objections to R&R | 1520-1537 |
| 21 | District Court Memorandum Opinion & Order | 1538-1559 |
| 22 | District Court Judgment Entry | 1560 |
| 23 | Notice of Appeal | 1561-1562 |

*/s/ Brian C. Howe*
Brian C. Howe
*Attorney for Petitioner-Appellant*